**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RYAN BREACH** | : | |
| | : | **CIVIL ACTION** |
| v. | : | **No. 23-1493** |
| | : | |
| **LOADSMART, INC.** | : | |

**McHUGH, J.**                                                    **January 30, 2024**

## <u>MEMORANDUM</u>

This case is brought by a trucking carrier against Loadsmart, Inc., a technology platform that matches carriers with shippers looking to move freight.  Plaintiff Ryan Breach asserts breach of contract and promissory estoppel claims against Loadsmart for a contract purportedly formed on February 24, 2022.  Defendant now moves to transfer venue to the Southern District of New York, pursuant to 28 U.S.C. § 1404 based principally upon the forum selection clause in Defendant's user agreement, which Plaintiff accepted when he first became a carrier using Loadsmart's platform.  I conclude that the forum selection clause applies here, even though the alleged contract did not explicitly incorporate by reference the user agreement, and further conclude that transfer is neither unconscionable nor against the public interest.  Defendant's motion will therefore be granted.[1]

---

[1] In the alternative, Defendant also moved to dismiss based on a failure to state a claim.  Because I find that transfer is proper, I do not reach the merits of Defendant's motion for dismissal.

I.        **Relevant Background**[2]

In late 2019, Plaintiff signed up as a carrier and user through Defendant's technology

platform.  Def.'s Motion, Ex. A ¶ 4 (May 26, 2023 Verification of Christopher Micks).  As part of

the sign-up process, Plaintiff accepted Defendant's user agreement.  *Id.* at ¶ 4-5; Oral Arg. Tr. at

37 (referring to the 2019 version of the user agreement as "the one my client signed").  The 2019

user agreement describes the nature of Defendant's services as follows:

> Loadsmart, as a technology platform, brings together Shippers and Carriers for the
> transportation of Shipments to, from, and between points in the United States and
> Canada, enabling Shippers to post details of desired and requested shipping and
> transportation needs, Carriers to accept such requests, and both parties to book and
> manage the resulting Shipments.

ECF 5 Ex. A.1 at I.A.  (User Agreement).  According to the user agreement, Defendant's services

also include "fleet management, asset tracking, internal shipment manag[ement], [and] analytics

among others" for its shippers and carriers.  *Id.* at I.C.  The agreement also delineates a series of

steps necessary to connect a shipper and carrier.[3]  *Id.* at I.B.1.

In addition, the agreement contains a dispute resolution clause:

> [A]ny claim, cause of action, or dispute (claim) that you as a User has with
> Loadsmart arising out of or relating to this Agreement must be brought exclusively
> in a state or federal court located in the State of New York.  The laws of the State
> of New York will govern this Agreement, as well as any claim that might arise
> between you and Loadsmart, without regard to conflict of law provisions.  You
> agree to submit to the personal jurisdiction of the courts located in New York City,
> NY for the purpose of litigating all such claims. . . .

---

[2] This case was filed on April 19, 2023, and assigned to the Honorable Edward G. Smith.  *See* ECF 1-3.
After this motion was filed, Judge Smith then referred the case to magistrate judge for a settlement
conference, but that effort proved unsuccessful.  On August 8, 2023, Judge Smith held oral arguments, ECF
16, but had not ruled before his tragic and untimely death.  The case was reassigned to me on December 1,
2023.

[3] The shipper posts initial details about its request.  It then receives a price (presumably from Loadsmart)
and may request transportation at that price (assuming Loadsmart locates a carrier).  The shipper then
provides additional shipment details, which Loadsmart sends out to its carriers.  And, once a carrier accepts,
according to the user agreement, the carrier and shipper are "legally bound."  User Agreement at I.B.1.

*Id.* at XXI.B. (omitting references to Canadian-origin shipments).

From 2019 to 2022, Plaintiff used Defendant's platform to match with shippers looking to move freight.  Oral Arg. Tr. at 39-40.  One of Plaintiff's "matches" included a specific route from the Pratt Industries store in Macungie, PA to the Home Depot distribution center in Breinigsville, PA, which paid him $900 per trip.  Pl.'s Resp. at 1.  Plaintiff serviced this same four-mile route on several occasions from December 2021 to January 2022.  *Id.*; Oral Arg. Tr. at 44-45.

On February 2022, Plaintiff and Loadsmart signed and exchanged a Contracted Lane Confirmation (CLC), which lowered Plaintiff's price for this route to $800.[4]  For each trip Plaintiff completed, he received a document titled "Rate Confirmation."  ECF 11 Ex. A.1 (Rate Confirmations).  The Rate Confirmations provided him with shipment details, such as the materials to be transported, date, time, and completion instructions, and a requirement that drivers use the Loadsmart driver app for tracking (with a $200 penalty for failure to do so).  *Id.*  The Rate Confirmations, unlike the CLC, expressly incorporated Defendant's user agreement.  *Compare* Rate Confirmations ¶ 7, *with* CLC.  Still, Plaintiff only briefly serviced the route under the CLC's lower price before Home Depot allegedly opted to use another freight broker.[5]  Motion at 4.

---

[4] Plaintiff contends the CLC provided him with an exclusive nine-month contract to continue servicing the same four-mile route in exchange for a lower price.  ECF 10 Ex. A, at 3 (CLC).  Defendant disagrees, contending that the terminology of "contracted rate" in the CLC merely refers to a non-binding, provisional rate that a shipper may pay for transport within a defined route for some period of time.  Motion at 2.  This memorandum does not purport to address the merits of this dispute.

[5] The parties seem to disagree about how many shipments Plaintiff completed pursuant to the CLC's lower price.  *Compare* Def.'s Motion at 4 ("Home Depot exercised its option to use the 'contracted rate' on the Macungie to Breinigsville Lane only *four times*, after which Home Depot opted to use another freight broker other than Loadsmart for Macungie to Breinigsville Lane.") (emphasis added), *with* Pl.'s Resp. at 2 ("After Plaintiff completed *only one shipment* under the Contract, Defendant stopped assigning shipments to him.") (emphasis added).  Based on the Rate Confirmations provided to the Court, Plaintiff received at least four shipments in February and March 2022.  *See* ECF 11 Ex. A (June 16, 2023, Verification of Christopher Micks) (attaching four Rate Confirmations, which Loadsmart's Vice President of Logistics Operations describes as "actual trips completed on the Home Depot contracted lane").

Plaintiff then filed the present suit, alleging that Defendant breached the CLC, causing him to lose out on at least $96,000 under the alleged contract, as well as significant relocation and trailer expenses in reliance of Defendant's assurances. ECF 1 at ¶ 53-71 (Complaint). Defendant in turn filed the present Motion to Dismiss for failure to state a claim or, in the alternative, to transfer based on 28 U.S.C. § 1404 and the parties' agreed upon forum selection in the user agreement.

## II.    Standard of Review

A plaintiff's choice of venue "should not be lightly disturbed." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995) (internal quotation and citation omitted). As such, the movant carries the burden of establishing the need for transfer under 28 U.S.C. § 1404(a).[6] *Id.* Ordinarily, a district court considering a § 1404(a) motion for transfer "must evaluate both the convenience of the parties and various public interest considerations." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 62 (2013). But the analysis changes in three important ways "when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum."[7] *Id.* at 63 (internal citation and quotation omitted).

First, "the plaintiff's choice of forum merits no weight." *Id.* "Rather, as the party defying the forum-selection clause, the *plaintiff* bears the burden of establishing that transfer to the forum

---

[6] Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."

[7] District courts have applied *Atlantic Marine*'s more limited analysis as to "clickwrap" or user agreements between technology platforms and their users, like the one at issue here. *See, e.g.*, *Kidstar v. Facebook, Inc.*, No. 18-13558, 2020 WL 4382279, at *4-5 (D.N.J. July 31, 2020) (granting motion to transfer venue to the Northern District of California based on Facebook's user agreement which contained a forum selection clause). A clickwrap agreement is posted on a website setting forth proposed terms for a contract which the user then electronically signs by clicking on a dialog box. *See Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007) (Giles, J.).

for which the parties bargained is unwarranted." *Id.* (emphasis added).  Second, a court must not consider the parties' private interests, and instead, must only consider public-interest factors.  *Id.* at 64.  Third, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules – a factor that in some circumstances may affect public-interest considerations."  *Id.*

"In deciding a § 1404(a) motion, a court is not limited to the pleadings, and may consider affidavits and other evidence."[8]  *Roller v. Red Payments L.L.C.*, No. 18-1834, 2019 WL 3802031, at *4 (E.D. Pa. Aug. 12, 2019) (citing, in part, *Atlantic Marine,* 571 U.S. at 61, n.4).

**III.   Discussion**

The forum selection clause's language is broad and covers the parties' alleged contract and conduct here.  Plaintiff presents four arguments as to why the forum selection clause is not controlling, but I reject those arguments as set forth below.

*i.   Distinct Contracts*

First, Plaintiff contends that the user agreement and the CLC are separate and distinct contracts.  Pl.'s Resp. at 8-9.  In support, Plaintiff relies on an eight-factor "test" proposed in *Camp Ne'er Too Late, LP v. SWEPI, LP*, 185 F. Supp. 3d 517, 522 (M.D. Pa. 2016).  Oral Arg. Tr. at 34.  But *Camp Ne'er Too Late* is not controlling, and I am not convinced that it provides a useful framework that can be generally applied in analyzing whether contracts are discrete.  The opinion in *Camp Ne'er Too Late* extracted the eight factors from a bankruptcy court decision which analyzed differences in two agreements, *In re AbitibiBowater Inc.*, 418 B.R. 815, 827-28 (Bankr.

---

[8] Plaintiff argues that the Court should not consider the Rate Confirmation documents, as these were not part of alleged contract.  Oral Arg. Tr. at 57.  But, as Judge Smith clarified during oral argument, under the motion to transfer standard, the Court may consider affidavits beyond the complaint and order limited discovery if required.  *Id.* at 55.

D. Del. 2009).  In my view, the bankruptcy court's decision was fact specific, and as a result, the relevance of its observations about differences in the agreements there is limited.

Here, the plain language of the parties' user agreement extends to "any claim . . . arising out of or *relating to*" the user agreement.  User Agreement at XXI.B (emphasis added).  Although the phrase "arising out of" is narrower in scope, the Third Circuit has given forum selection clauses with "relating to" or similar language broad application.  *See John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) (interpreting the phrase "arise[s] . . . in relation to" in a forum selection clause to mean "the origin of the dispute is related to" or has some "logical or causal connection" to that agreement) (citing Webster's Third New International Dictionary, 1916 (1971)); *see also Decoration Design Sols., Inc. v. Amcor Rigid Plastic USA, Inc.*, No. 20-2667, 2020 WL 6482696, at *4 (D.N.J. Nov. 4, 2020) (noting the phrase "related to" in a forum selection clause is "extremely broad" and merely requires "an association with or reference to the applicable subject") (citing Black's Law Dictionary 102 (11th ed. 2019)).[9]

Here, there is a clear logical connection between the user agreement and the CLC.  The parties' relationship arose out of the technology platform's matching capability.  *See* User Agreement at I. (describing Defendant's services).  Beyond this matching process, Defendant provides its users (both carriers and shippers) with other services, including management, tracking,

---

[9] Whether a forum selection clause extends to a particular dispute is governed by state law.  *Decoration Design Sols., Inc.*, 2020 WL 6482696 at *4 (citing *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 58 (3d Cir. 2018)).  The parties here disagree on whether Pennsylvania or New York law applies, but otherwise cite to federal law applying general contract law principles in their forum selection arguments.  *See* Pl.'s Resp. at 8-12 (citing to *Camp Ne'ev Too Late*, which relies on a federal bankruptcy court's opinion to determine the issue of transfer); Def.'s Reply at 2-5 (citing *Decoration Design Solutions* and *John Wyeth*, which apply general contract law principles).  In any event, Plaintiff concedes "New York recognizes the same contract and equitable principles as Pennsylvania."  Pl.'s Resp. at 4.  As such, I apply general contract law principles here, as well.

and analytics.  *Id.* at I.C.  These services are useful not only for the completion of shipments, but also as an extension of Loadsmart's role as a broker between its carriers and shippers.[10]

The CLC pertains to the price brokered by Defendant, for a specific four-mile route involving the same carrier and shipper, both already active users of Defendant's services. Although the user agreement does not describe the formation of a CLC, in practical terms, the CLC was merely another way through which Defendant encouraged matching through its platform. Oral Arg. Tr. at 17 (describing other ways Loadsmart recruits its shippers and carriers).  In further support of the logical connection between the two, the CLC led to several Rate Confirmation documents, which mandated the use of the Loadsmart app to track Plaintiff's transportation status.[11]  *See generally* Rate Confirmations.

As such, I conclude that the present dispute, arising from the parties' CLC, is one "relating to" the user agreement.[12]

ii.     *The need for incorporation by reference*

Second, Plaintiff argues "[w]hen a party is seeking to invoke a dispute resolution provision in a different contract, at least one of the two contracts must incorporate the other by reference." Pl.'s Resp. at 10.  But Plaintiff provides no legal authority to support this position, citing only to

---

[10] In fact, if shippers and carriers want to continue matching, they must do so through Defendant or wait one year after using the platform.  User Agreement at V.C. (non-solicitation clause).

[11] Although the Rate Confirmations also seem to allow tracking through what the Court presumes to be other technology platforms, the penalty fee for failure to track through the Loadsmart app confirms the parties' intent to continue to relate their activities back to Defendant's own services, including through its app.  *See* Rate Confirmations (noting carriers could also track using "Project 44" and "EDI integration" platforms, though with a fee penalty).

[12] Plaintiff warns of a potential slippery slope where "any initial agreement parties enter into, if it had enough legalese in it, [] could relate to any of the subsequent agreements."  Oral Arg. Tr. at 50.  I do not find that slippery slope to be at issue here, especially because there is a logical connection between the user agreement, which Plaintiff accepted just a few years prior to the CLC, and he continued to service routes through Loadsmart, and the alleged contract.

case law explaining how agreements *can* incorporate by reference.  Plaintiff's argument also presumes that the CLC is itself a contract, a disputed question that I need not address here.  More importantly, Plaintiff overlooks the fact that each Rate Confirmation he received pursuant to the CLC specifically referred back to the user agreement containing the forum selection clause. Rate Confirmations ¶ 7.

Plaintiff then argues "it would result in surprise and hardship to Plaintiff to apply the unrelated, two-year-old user agreement (which is a contract of adhesion) to [an] individually negotiated Contract."  Pl.'s Resp. at 10.  For the reasons set forth above, I do not find the user agreement unrelated, as Plaintiff continued to accept shipments through Defendant's technology platform for two years.  Plaintiff cannot credibly claim surprise by the terms contained in the user agreement.

iii.    *Unconscionability*

Third, Plaintiff asserts the user agreement should not apply to him because it is an unconscionable adhesion contract.  Pl.'s Resp. at 11.  According to Plaintiff, Defendant's 22-page user agreement contains convoluted language that commercial carriers like himself are not likely to understand.  *Id.* at 11-12.  Moreover, if carriers do not consent to the user agreement, they lose out on the opportunity for job assignments.  *Id.*  Finally, Plaintiff contends that its terms unreasonably favor Defendant by capping damages at $50.  *Id.*

Courts have generally recognized that the doctrine of unconscionability involves both "procedural" and "substantive" elements.  *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 265 (3d Cir. 2003).  Procedural unconscionability "pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language."  *Id.* (citation omitted).  "This element is generally satisfied if the agreement

constitutes a contract of adhesion," where the "party with excessive bargaining power" prepares it and presents it to the other party for signature on a take-it-or-leave-it basis. *Id.* But these types of contracts are not necessarily unconscionable merely because of unequal bargaining power. *Id.* The party challenging the contract must also prove "substantive unconscionability," through the existence of terms that "unreasonably favor one party to which the disfavored party does not truly assent." *Id.* In this respect, courts generally look for one-sided results that "shock the conscience." *Tricome v. eBay, Inc.*, No. 9-2492, 2009 WL 3365873 (E.D. Pa. Oct. 19, 2009) (Jones II, J.) (citing *Feldman*, 513 F. Supp. 2d at 242).

I find *Tricome* persuasive here. The plaintiff in *Tricome* was an "expert seller" on eBay's online platform. *Id.* at *1. As part of eBay's sign-up process, the seller accepted a user agreement, which contained a forum selection clause. *Id.* According to the seller, the user agreement was procedurally unconscionable because he never had the opportunity to discuss or negotiate the forum selection clause. *Id.* at *2. But the court in *Tricome* pointed out several reasons why the user agreement was not a contract of adhesion:

- It was not necessary for the plaintiff to agree to the user agreement. The plaintiff "did so merely to increase his business opportunities (and thus, his profits)."
- The plaintiff had the opportunity to carefully read the user agreement and reject it.
- The platform "did not engage in high pressure tactics or put external pressure on" the plaintiff to accept the user agreement, "it simply made the opportunity available to the general public."
- The plaintiff was an experienced businessman who sought out the technology platform's services, chose to register as a user, and by doing so, acknowledged the user agreement (including the forum selection clause).
- The platform has users located across the U.S. and thus, has a legitimate basis for forum selection.

*Id.* at 2-3. These considerations apply with equal force here.

The court in *Tricome* likewise did not find substantive unconscionability as to the forum selection clause because "[e]Bay operates around the world and it [is] not shocking for it to want to focus its legal defense in a particular forum rather than have to litigate in potentially hundreds or thousands of other jurisdictions." *Id.* (noting that the forum selection clause also "conserves litigant and judicial resources by dispelling confusion over where suits are to be brought"). In similar fashion, Loadsmart operates nation-wide, and a forum selection clause serves a legitimate business interest.

Finally, although the $50 cap in damages is concerning, I view that term separate from the validity of the forum selection clause and leave the enforceability of that limitation to the transferee court.

iv.    *Interest of Justice*

Fourth, Plaintiff argues transferring this case to New York would not be in the interest of justice because Pennsylvania law applies, the contract, services, and equipment are in Pennsylvania, and no party or witnesses are in New York. Pl.'s Resp. at 12-13; Oral Arg. Tr. at 48-49. The Supreme Court has characterized the "interest of justice" under § 1404 as encompassing both public and private considerations. *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 30 (1988). But, having found an enforceable forum selection clause, my analysis is limited to any applicable public interests. *Atlantic Marine*, 571 U.S. at 64. Courts have considered various public interests, including: "the enforceability of the judgment; practical considerations that could make the trial easy, expeditious, or inexpensive; the relative administrative difficulty in the two fora resulting from court congestion; the local interest in deciding local controversies at home; the public policies of the fora; and the familiarity of the trial judge with the applicable state law in diversity cases." *Jumara*, 55 F.3d at 879-80 (cleaned up) (internal citations omitted).

I see no reason why the parties would be unable to enforce a judgment and access the judicial system expeditiously and without difficulty in the Southern District of New York.  Even if Pennsylvania law applies, as Plaintiff concedes, "New York recognizes the same contract and equitable principles as Pennsylvania," Pl.'s Resp. at 4, and the highly experienced judges of the Southern District can readily preside.

As such, I conclude that a transfer to the Southern District of New York is not against the public interest.

**IV.    Conclusion**

For the reasons set forth above, Defendant's Motion for Transfer will be granted.  An appropriate Order follows.

    /s/ Gerald Austin McHugh   
United States District Judge
